FERRO LABELLA & ZUCKER L.L.C.
27 Warren Street
Hackensack, New Jersey 07601
(201) 489-9110
Attorneys for *Qui Tam* Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA *ex rel.*
NORA B. KIRSCHNER, M.D., F.H.M.,
BRENT HERR, M.D., MARK W. JOY, M.D.,
and MARK A. MAIOCCO, M.D.,

and

THE STATES of CALIFORNIA, GEORGIA,
ILLINOIS, INDIANA, LOUISIANA, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA,
TENNESSEE, TEXAS and WASHINGTON,
*ex rel.* NORA B. KIRSCHNER, M.D., F.H.M.,
BRENT HERR, M.D., MARK W. JOY, M.D.,
and MARK A. MAIOCCO, M.D.,

and

THE COMMONWEALTH of VIRGINIA *ex
rel.* NORA B. KIRSCHNER, M.D., F.H.M.,
BRENT HERR, M.D., MARK W. JOY, M.D.,
and MARK A. MAIOCCO, M.D.,

Plaintiff,

v.

APOGEE MEDICAL MANAGEMENT, INC.
d/b/a APOGEE PHYSICIANS,

Defendants.

Honorable Jose L. Linares

Civil Action No. 11-7220 (JLL)

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL FALSE
CLAIMS ACT [31 U.S.C. § 3729 *et seq.*];
CALIFORNIA FALSE CLAIMS ACT [Cal.
Govt. Code § 12650 *et seq.*]; CALIFORNIA
PENAL CODE [Cal. Pen. Code § 550(a)(1),
(5), and (6)]; CALIFORNIA INSURANCE
CODE [Cal. Ins. Code § 1871.7(b)];
GEORGIA STATE FALSE MEDICAID
CLAIMS ACT [O.C.G.A. § 49-4-168 *et seq.*];
ILLINOIS WHISTLEBLOWER REWARD
AND PROTECTION ACT [740 Ill. Comp.
Stat. § 175/3 *et seq.*]; ILLINOIS
INSURANCE CLAIMS FRAUD
PREVENTION ACT, [740 Ill. Comp. Stat.
§ 92]; INDIANA FALSE CLAIMS AND
WHISTLEBLOWER PROTECTION ACT
[Ind. Code Ann. § 5-11-5.5-1 *et seq.*];
LOUISIANA MEDICAL ASSISTANCE
PROGRAMS INTEGRITY LAW [La. Rev.
Stat. § 46.437.1 *et seq.*]; NEW JERSEY
FALSE MEDICAID CLAIMS ACT [N.J.
Stat. § 2A:32C-1 *et seq.*]; NEW MEXICO
MEDICAID FALSE CLAIMS ACT [N.M.
Stat. Ann. § 27-14-1 *et seq.*]; NEW YORK
FALSE CLAIMS ACT [NY CLS St. Fin. §
187 *et seq.*]; NORTH CAROLINA FALSE
CLAIMS ACT [N.C. gen. stat. art. 52 § 1-
607(a)(1) and (2)];

OKLAHOMA MEDICAID FALSE CLAIMS ACT [OKLA. STAT. 63 § 5053.1(b)(1) and (2)]; TENNESSEE MEDICAID FALSE CLAIMS ACT [TENN. CODE ANN. § 71-5-181 *et seq*.]; TEXAS MEDICAID FRAUD PREVENTION LAW [TEX. HUM. RES. CODE ANN. § 36.001 *et seq*.]; WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT [Rev. Code Wash. § 74.09C.010, *et seq*.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [VA. CODE ANN § 8.01-216.1 *et seq*.]

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

# TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 4

III.    PARTIES ............................................................................................................. 5

IV.     MEDICARE BILLING FOR HOSPITALISTS .................................................. 8

      A.      The Medicare Act ...................................................................................... 8

      B.      Medical Necessity and Documentation .................................................. 10

      C.      Hospitalist Billing and Coding ............................................................... 12

      D.      The CMS Definition of Initial and Subsequent Observation and
              Inpatient Care .......................................................................................... 14

              1.      Initial Observation Care ............................................................. 15

              2.      Initial Inpatient Care ................................................................. 16

              3.      Same Day Observation or Inpatient Care ................................. 17

              4.      Subsequent Inpatient Care ........................................................ 17

      E.      The CMS Documentation Requirements for Initial and Subsequent
              Hospital Care .......................................................................................... 18

              1.      Documentation of History ......................................................... 18

               2.      Documentation of Examination ................................................. 20

               3.      Documentation of the Complexity of Medical Decision-
                    Making ....................................................................................... 21

      F.      The CMS Definition and Coding of Discharge Management Services ............... 23

      G.      The CMS Definition and Coding of Critical Care Services ................................. 23

V.      FACTUAL BACKGROUND ............................................................................ 25

      A.      Background .............................................................................................. 25

B.    Apogee Coerced Its Hospitalist Employees to "Upcode" ................................... 27

    1.    Apogee Pressured Its Hospitalists to Bill at the Highest-Level Codes and Misrepresented "National Averages" to Increase the Pressure .............................................................................................. 27

        a.    Apogee required hospitalists to conform to percentage requirements for billing at the highest-level codes...................... 27

        b.    Apogee lied to hospitalists about national averages for the use of highest-level codes ...................................................... 27

        c.    Apogee's use of highest-level codes far exceeded national averages ...................................................................... 28

        d.    Apogee deliberately ignored the data it collected showing hospitalist upcoding ...................................................... 30

    2.    Apogee Enforced Its Highest-Level Coding Requirements by Monitoring and Counseling Non-Compliant Hospitalists ...................... 32

    3.    Apogee Enforced Its Highest-Level Coding Requirements by Threatening to Fire Non-Compliant Hospitalists ................................... 36

    4.    Apogee Pressured Its Hospitalist Employees to Over-Document to Justify Upcoding ............................................................... 36

        a.    Apogee's business model focused on documentation, not medical necessity ................................................................... 36

        b.    Apogee's "Program Director Audits" ........................................... 38

        c.    Apogee's "Pocket Guide" ............................................................ 41

    5.    Apogee Pressured Hospitalists to Recruit Patients From the Emergency Room ...................................................................... 42

C.    Improper Medicare and Medicaid Reimbursements to Apogee .......................... 45

D.    Apogee Constructively Discharged Relators Because They Objected to Apogee's Illegal Practices ............................................................... 46

COUNT I  FALSE CLAIMS ACT  31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) ........................... 50

COUNT II  FALSE CLAIMS ACT  31 U.S.C. § 3729(a)(1)(G) ................................................ 51

COUNT III  CALIFORNIA FALSE CLAIMS ACT Cal. Govt. Code
§§ 12651(a)(1) and (2) ................................................................................ 52

COUNT IV  CALIFORNIA INSURANCE CODE Cal. Ins. Code § 1871.1(b)...................... 53

COUNT V  GEORGIA STATE FALSE MEDICAID CLAIMS ACT O.C.G.A. § 49-
4-168.1(a)(1) and (2) ................................................................................... 55

COUNT VI  ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
740 Ill. Comp. Stat. § 175/3(a)(1) and (2) .................................................. 56

COUNT VII  ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT 740
Ill. Comp. Stat. § 92.................................................................................... 57

COUNT VIII  INDIANA FALSE CLAIMS AND WHISTLEBLOWER
PROTECTION ACT Ind. Code Ann. §§ 5-11-5.5-2(b)(1), (2), and (8)........................ 59

COUNT IX  LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY
LAW La. Rev. Stat. § 46:438.3(A) and (B)................................................. 60

COUNT X  NEW JERSEY FALSE CLAIMS ACT N.J. Stat. § 2A:32C-3(a) and (b) ............ 61

COUNT XI  NEW MEXICO MEDICAID FALSE CLAIMS ACT N.M. Stat. Ann.
§§ 27-14-4(A)-(C) ....................................................................................... 62

COUNT XII  NEW YORK FALSE CLAIMS ACT NY CLS St. Fin. § 189(1)(a), (b),
and (g)......................................................................................................... 63

COUNT XIII  NORTH CAROLINA FALSE CLAIMS ACT N.C. Gen. Stat. Art.
52 § 1-607(a)(1) and (2)............................................................................... 64

COUNT XIV  OKLAHOMA MEDICAID FALSE CLAIMS ACT Okla. Stat. 63
§ 5053.1(b)(1) and (2)................................................................................. 65

COUNT XV  TENNESSEE MEDICAID FALSE CLAIMS ACT Tenn. Code Ann.
§ 71-5-182(a)(1)(A) and (B) ........................................................................ 66

COUNT XVI  TEXAS MEDICAID FRAUD PREVENTION LAW Tex. Hum. Res.
Code Ann. § 36.002(1) and (4)................................................................... 67

COUNT XVII  VIRGINIA FRAUD AGAINST TAXPAYERS ACT Va. Code Ann.
§ 8.01-216.3(a)(1) and (2) ........................................................................... 68

COUNT XVIII  WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT REV.
CODE WASH. § 74.09C.010, *et seq.* ........................................................... 69

COUNT XXIX  FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3730(h)................................. 70

COUNT XXX  NEW JERSEY FALSE CLAIMS ACT N.J. STAT. § 2A:32C-10.................... 71

COUNT XXXI  WRONGFUL DISCHARGE IN VIOLATION OF THE
     CONSCIENTIOUS EMPLOYEE PROTECTION ACT N.J. STAT. § 34:19-5 ............ 71

PRAYER FOR RELIEF ........................................................................................................... 73

DEMAND FOR JURY TRIAL ............................................................................................... 75

## I.     INTRODUCTION

1.      This is an action brought by Relators Nora B. Kirschner, M.D., F.H.M., Brent Herr, M.D., Mark W. Joy, M.D., and Mark A. Maiocco, M.D. ("Relators") on behalf of the United States and the States of California, Georgia, Illinois, Indiana, Louisiana, North Carolina, New Jersey, New Mexico, New York, Oklahoma, Tennessee, Texas, Washington, and the Commonwealth of Virginia (the "States"), to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* ("the FCA" or "the Act") and state analogues thereto, arising from a fraud upon the United States and the States in connection with claims for Part B Medicare, Medicaid, and other government health insurance reimbursements.

2.      Defendant Apogee Medical Management, Inc. d/b/a Apogee Physicians ("Apogee"), headquartered in Phoenix, Arizona, is a company that employs hospitalists and contracts their services to hospitals and health care systems.  A "hospitalist" is a primary care physician who treats patients in hospital settings, usually inpatients.

3.      According to Apogee's website, it employs more than 450 full-time hospitalists. It generates over $100 million in annual revenues.  Relators are hospitalists who were employed by Apogee at Yakima Regional Medical and Cardiac Center ("Yakima Regional") in Yakima, Washington from 2010 to in or about June 2011.

4.      Hospitalists use a limited number of reimbursement codes for the services they provide to patients (called "evaluation and management services").  For each type of evaluation and management service they provide, they can code the patient visit at a gradually increasing "level" to reflect the complexity of the patient's condition and the treatment they provide. Higher level codes generate higher insurance reimbursements.

5.      Apogee's business model is to systematically coerce its employees to "upcode." Upcoding is when a provider uses a procedure code that exaggerates the severity of the patient's condition or the services provided, resulting in a higher reimbursement.  Upcoded claims for reimbursement submitted to federal and state health insurance programs violate the False Claims Act.

6.      Apogee set performance standards for its hospitalist employees that required them to code a large percentage of patient visits at the highest possible level.  Its executives falsely told hospitalist employees that these standards were "national averages."  In reality, the distribution of highest-level codes Apogee required its hospitalists to meet exceeded Medicare's national average by 12% to 41%.

7.      Apogee executives then pressured employees to falsify their documentation, or provide services that were not medically necessary, to justify the inflated codes.  Apogee submitted these inflated claims to government insurance programs.  For some of Apogee's claims, the level of service for which it billed was never provided.  For others, Apogee lied about the level of service needed and changed the government for non-medically necessary services.

8.      An audit of the patient records and codes used by Apogee hospitalists will show that Apogee routinely – and illegally – submitted claims for hospitalist services using higher level codes than were medically necessary.

9.      Apogee knew, or deliberately ignored, that its pressure tactics caused its hospitalists to upcode.  It performed monthly audits of its hospitalists' compliance with Medicare and Medicaid coding requirements.  These audits demonstrated to Apogee executives that a large percentage of its claims using the highest-level codes were improper.  Yet Apogee never notified

the government or offered any reimbursement for the overpayments it received.  And Apogee

continued to seek reimbursement for all claims coded at the highest levels.  The United States

and the States have continued to pay these claims to this day.

      10.    Apogee strictly enforced its upcoding business model through the following

corporate practices:

      a.    Apogee required hospitalists to meet pre-determined percentages for using

the highest-level codes for each type of patient encounter, regardless of medical necessity.  As an

Apogee executive wrote:  "Codes 99223 and 99239 both should be 80%.  99233 should be 50%."

In contrast, Medicare's published average for physicians' use of these same codes is 68%, 39%,

and 25% respectively.

      b.    Apogee lied to its hospitalist employees about national averages for the

use of highest-level codes.

      c.    Apogee enforced its highest-level coding requirements by monthly

computerized monitoring, followed by counseling of non-compliant hospitalists.

      d.    Apogee imposed on its employees an average charge per encounter

requirement, applied regardless of patients' conditions.

      e.    Apogee executives required hospitalists to provide written justification of

their use of lower-level codes.

      f.    Apogee threatened to fire hospitalists who did not meet required coding

distributions.

      g.    Apogee executives pressured hospitalists to perform unnecessary work to

justify using the highest-level codes.

h.      Apogee executives coached hospitalists on using "magic words" about patients' conditions that government guidance states can justify highest-level codes.

i.      Apogee provided its hospitalists a "Pocket Guide" on coding to carry with them that completely ignored the touchstone for compliant coding, medical necessity.

j.      Apogee provided Program Directors at each hospital with a tool to audit hospitalist coding that also ignored medical necessity.

k.      Apogee required hospitalists to recruit patients for admission to the hospital when their patient "census" was low and pressured them to falsely justify the admission in patient records when medical necessity was lacking.

11.     Relators, Drs. Kirschner, Herr, Joy, and Maiocco, seek through this action to recover damages and civil penalties arising from Apogee's making or causing to be made false or fraudulent records, statements, and/or claims in connection with false or fraudulent claims for Medicare, Medicaid, and other federal and state health insurance reimbursement.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Relators establish subject matter jurisdiction under 28 U.S.C. § 3730(b).  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint for which Relators are not "original sources."  Prior to filing this complaint, Relators voluntarily provided the United States Attorney's Office for the District of New Jersey the information contained in this Complaint.

13.     This Court has personal jurisdiction over defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because defendant has minimum contacts with the United States.

14.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendants can be found in, reside, and transact business in the District of New Jersey. At all times relevant to this Complaint, defendant Apogee regularly conducted substantial business within the District of New Jersey.

## III.     PARTIES

15.     Relator Nora Kirschner, M.D., F.H.M. is a resident of the State of Washington. Dr. Kirschner attended Tufts University and received a Bachelors of Arts degree cum laude in Child Study. In 1984, she received a Master of Science degree in physiology from Georgetown University. Dr. Kirschner graduated from Georgetown University School of Medicine in 1988. During medical school, she was inducted into the Alpha Omega Alpha Medical Honor Society and awarded the Janet M. Glasgow Memorial Achievement Citation from the American Medical Women's Association. In 1997, Dr. Kirschner established one of the first hospitalist programs in the country in Portland, Oregon. In 2007, she joined Yakima Regional, becoming the Hospitalist Program Director in 2008. While at Yakima Regional, she was on the hospital's Board of Directors, was Vice President of the Department of Medicine, and served on the Physician Performance and Peer Improvement Committee. Dr. Kirschner is a member of the Society of Hospital Medicine and in 2010 became a Fellow of Hospital Medicine. She was employed by Apogee from early 2010 until she resigned on April 30, 2011. While employed by Apogee, Dr. Kirschner was either Program Director or Co-Director of Apogee's hospitalist program at Yakima Regional.

16.     Relator Brent Herr, M.D. is a resident of the State of Washington.  Dr. Herr received his Doctorate in Medicine from Michigan State University College of Human Medicine in 1993.  From 1996 to 2006, He was in full-time outpatient and inpatient family practice in Lexington, Michigan.  During this time, he was the assistant chief of the Family Practice Department at Port Huron Hospital and served on the St. Clair County Independent Practice Association Board and the Mercy Health System Physician Hospital Organization Medical Management Committee.  In 2006, Dr. Herr founded the hospitalist program at Yakima Regional with Dr. Joy.  He was Chairman of the Medicine Department at Yakima Regional in 2008, was Chairman of the Patient Care Committee in 2010, and currently (among other committees) serves as Vice-Chair of the Medicine Department.  Dr. Herr is on the Adjunct Clinical Faculty staff of Pacific Northwest University of Health Sciences-College of Osteopathic Medicine in Yakima. He was employed by Apogee at Yakima Regional from early 2010 to in or about June 2011.

17.     Relator Mark W. Joy, M.D. is a resident of the State of Washington.  Dr. Joy received his Bachelor of Science degree in 1985 from Southern Oregon State College and his Doctorate in Medicine in 1993 from Oregon Health Sciences University.  He was board certified in family practice medicine in 1996 and recertified in 2003.  Dr. Joy was Chairman of the Medical Department at Port Huron [Michigan] Hospital in 2005 and 2006.  In 2006, Dr. Joy co-founded the hospitalist program at Yakima Regional.  He has been a voting member of the Medical Executive Committee of Yakima Regional from 2007 to the present, a member-at-large of the Medicine Department from 2007-2010, and Chairman of the Medical Department since 2011.  Dr. Joy was employed by Apogee at Yakima Regional from early 2010 to in or about

June 2011.  In 2010, Dr. Joy was Associate Director of Apogee's hospitalist program at Yakima Regional.

      18.     Relator Mark A. Maiocco, M.D. is a resident of the State of Washington. Dr. Maiocco graduated with a Bachelor of Science degree in microbiology from University of Washington in 1987.  He worked for Immunex Corporation from 1987 to 1990 in the field of molecular genetics, researching expression systems in bacteria and yeast for soluble receptors for cytokines – molecules now known to regulate the human immune system.  He received his Doctorate in Medicine from the University of Washington School of Medicine in 1994.  During his residency at the Oregon Health Sciences University, he was named both Student Teacher of the year and Resident of the year.  He has been a member of the Department of Family Practice and the Department of Medicine and served on the Ethics Committee at Yakima Regional.  He currently serves as a physician on the Diocesan Lay Advisory Board, advising the Bishop of Yakima on any suspected abuse in the diocese.  In this capacity, he participated in creating formal protocols for dealing with Church abuse.  Dr. Maiocco was employed by Apogee at Yakima Regional from early 2010 to in or about June 2011.

      19.     Defendant Apogee Medical Management, Inc., d/b/a Apogee Physicians, is a provider of inpatient care through staff hospitalists.  Apogee is organized under the laws of the state of Arizona with its headquarters in Phoenix, Arizona.  Apogee has entered into contracts with numerous hospitals in New Jersey to supply hospitalists and operate their hospitalist program.

      20.     Apogee was founded in 2002 by Michael W. Gregory, M.D.  It operates hospitalist programs at 71 hospitals throughout the country (December 2010 data).  Since its

founding in 2002, Apogee has grown to employ over 450 physicians and nurse practitioners in 28 states.  Its website reports that the company generates over $100 million in annual revenues.

21.     Until late spring 2011, Apogee was organized into three divisions, West/ Southwest, Midwest, and North/Southeast (in late spring 2011, it transformed its three divisions into four).  In Division I, West/Southwest, it provides hospitalists to 25 hospitals.  According to internal data, Division 1, where Relators were employed, generated $2.3 million in billings per month as of early 2011, annualizing to $27.6 million.

22.     Michael Gregory is Chairman of Apogee.  Apogee's executive leadership includes Steve G. Cervi-Skinner, M.D., Chief Medical Officer; Peter W. Thompson, M.D., Chief of Clinical Operations; and Kirk A. Butler, M.D., Chief of Program Financial Performance. Gregory's brother, Kevin W. Gregory, serves as Apogee's "Chief of Non-Clinical Operations" and created the computerized system for monitoring hospitalists' coding that Apogee used to target physicians not coding at the required highest levels.

## IV.     MEDICARE BILLING FOR HOSPITALISTS

### A.     The Medicare Act

23.     Congress enacted the Medicare Health Insurance for the Aged Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Act, in 1965.  Medicare is a federal program administered by the Center for Medicare and Medicaid Services (CMS), an agency of the U.S. Department of Health and Human Services (HHS).  It is funded through the U.S. Treasury, in part by premiums, compulsory payroll taxes, and other payments made by or on behalf of its beneficiaries.  All people 65 or older, certain disabled individuals, and patients with end-stage renal disease are eligible for Medicare benefits, regardless of their individual financial circumstances.

24.     The Medicare program pays for medical services under two separate systems, from two separate trust funds.  Hospital, skilled nursing facility, and institutional insurance benefits are paid for under Part A of the program, through a system administered by Medicare "intermediaries."  42 U.S.C. § 1395c - 1395i-2.  Part A is financed by compulsory payroll taxes, which are directed to the federal hospital insurance trust fund.  42 U.S.C. § 1395g.  Other medical insurance benefits are paid for under Part B of the program, through a system administered by Medicare "carriers."  42 U.S.C. §§ 1395k, 1395l, 1395x(s).  General Part B benefits cover a wide array of medical services and devices, including physician, ambulance, outpatient hospital, and laboratory services, durable medical supplies, diagnostic tests, and other non-institutional health services.  Part B benefits are financed by general federal revenues and premiums paid by enrollees, directed into the supplemental medical insurance trust fund.  42 U.S.C. § 1395t.

25.     The physician fee schedule is the basis for Medicare reimbursement for all physician services beginning in January 1992.  42 U.S.C. §§ 1395w-4(a)(1).  Section 1848(c)(5) of the Act required the Secretary of HHS to develop a uniform coding system for all physician services.  42 U.S.C. §§ 1395w-4(c)(5).  The American Medical Association's "Current Procedural Terminology" ("CPT") maintains a numeric coding system for physicians' services. In 1983, CMS adopted the CPT as part of Medicare Healthcare Common Procedure Coding System (HCPCS) and mandated the providers use HCPCS to report physician services to Medicare.

26.     CMS issues binding guidance to its carriers in the form of claims processing manuals and memoranda.

**B.      Medical Necessity and Documentation**

27.      Government insurance programs will reimburse for physician services only if the services were (i) actually provided and (ii) medically necessary.  Section 1862(a)(1)(A) of the Medicare Act, 42 U.S.C. §§ 1395y, states that "no payment may be made under Part A or Part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member…."

28.      If a physician provides services that are not medically necessary, they are not reimbursable by government insurance programs.

29.      Section 1833(e) of the Act requires that providers furnish "such information as may be necessary in order to determine the amounts due" to receive Medicare payment.  42 U.S.C. §§ 1395l.

30.      Claims for services accompanied by documentation that falsifies or misrepresents the services provided do not meet the requirements of section 1833(e) and are not reimbursable.

31.      Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes.  The medical record chronologically documents the care of the patient and is an important element of contributing to high quality care.

32.      The medical record serves as the legal document to verify the care provided.  *See* 42 C.F.R. § 482.24(c).  Documentation is the source of accurate Medicare insurance claim review and payment.

33.     CMS requires that the CPT codes reported on the health insurance claim or billing statement be supported by the documentation in the medical record.  The code must best represent the services actually provided during the visit.

34.     The HHS Office of Inspector General has found repeated problems with lack of documentation suggesting physician upcoding for hospitalist services.  *See Final Report of Improper Fiscal Year 2002 Medicare Fee-for-Service Payments* (A-17-02-02202), from Janet Rehnquist, Inspector General, to Thomas Scully, Administrator, Centers for Medicare and Medicaid Services (Jan. 16, 2003), at 11, (for 76.3% of reviewed patient encounters coded as 99233 and 36.7% coded as 99232, documentation did not support level of services coded, so services billed were not medically necessary); *Final Report of Improper Fiscal Year 2001 Medicare Fee-for-Service Payments* (A-17-02-02202), from Rehnquist to Scully (Feb. 15, 2002), at 12 (for 42% of reviewed patient encounters coded as 99233, documentation did not support level of services coded); *Final Report of Improper Fiscal Year 2000 Medicare Fee-for-Service Payments* (A-17-02-02202), from Michael F. Mangaro, Acting Inspector General, to Michael McMullan, Acting Principal Deputy Administrator, Centers for Medicare and Medicaid Services (Feb. 5, 2002), at 12 (for 49% of reviewed patient encounters coded as 99233, documentation did not support level of services coded).

35.     CMS has determined that physician coding deficiencies have and continue to cost taxpayers tremendous amounts of money.  *See* Centers for Medicare and Medicaid Services, *Improper Medicare Fee-For-Service Payments Report – November 2007 Report* (in 2007 alone, projecting improper payments of $200 million for undocumented patient encounters coded as

99233, $97 million for encounters coded as 99223, $79 million for encounters coded as 99232, $36 million for encounters coded as 99291, and $23 million for encounters coded as 99222).

**C.     Hospitalist Billing and Coding**

36.     Hospitalists typically bill using CPT codes for patient "evaluation and management services."

37.     These include CPT 99218-99220) (initial observation hospital care services), CPT 99221-99223 (initial inpatient hospital care services), CPT 99231-99233 (subsequent inpatient hospital visits), 99234-99236 (same-day observation or inpatient care services), 99238-99239 (hospital discharge day management services), and CPT 99291-99292 (critical care services).

38.     The first four codes above, for initial and subsequent observation or inpatient visits, have three levels, for low, moderate, and high complexity. (Thus, CPT 99221 is a low complexity initial encounter, CPT 99222 is one of moderate complexity, and CPT 99223 is an initial encounter of high complexity.) The more complex the visit, the higher level of code the physician may bill.

39.     Visits that consist primarily of counseling or coordination of care are coded differently. They also have different levels, but for these visits time is the controlling factor to qualify for a particular level of evaluation and management service. When counseling or coordination of care dominates the physician encounter, the total time of the encounter must be documented and the record describe the counseling and activities to coordinate care.

40.     CMS has issued specific guidance to physicians for billing and documentation of evaluation and management services in a publication named the Claims Processing Manual, Pub. 100-04, Ch. 12, § 30.6.

41.     The Medicare Claims Processing Manual states that the Act's medical necessity requirement is paramount to reimbursement:

> Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted.  The volume of documentation should not be the primary influence upon which a specific level of service is billed.

Medicare Claims Processing Manual, § 30.6.1(A).  Likewise, to bill the highest levels of evaluation and management codes, the services furnished must meet the definition of the code. Medicare Claims Processing Manual, § 30.6.1(D).

42.     Furthermore, the documentation prepared by the physician must justify the chosen level of service.  The Manual states: "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code.  It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted…. Documentation should support the level of service reported."  Medicare Claims Processing Manual, § 30.6.1(A).

43.     CMS has prescribed specific documentation requirements for physicians.  In December 2010, CMS issued the "Evaluation and Management Services Guide" as a reference tool for hospitalists and others doctors who use evaluation and management services codes.  The 2010 Guide supplements guidelines issued by CMS in 1995 and 1997 on how to code and document for evaluation and management services.  "All physicians and qualified nonphysician practitioners shall follow the E/M documentation guidelines for all E/M services."  Medicare Claims Processing Manual, § 30.6.10(A).

44.    The 2010 Guide, the "1997 Documentation Guidelines for Evaluation and Management Services," and the "1995 Documentation Guidelines for Evaluation and Management Services" set out detailed guidance for physicians who are coding evaluation and management services.

45.    The 2010 Guide echoes the primacy of medical necessity in the Medicare Act and the Claims Processing Manual.  "[I]n order to receive payment from Medicare for a service, the service must … be considered reasonable and necessary.  Therefore, the service must be:

- "Furnished for the diagnosis, direct care, and treatment of the beneficiary's medical condition …; and
- "Compliant with the standards of good medical practice."

46.    The 2010 Guide provides that "[w]hen billing for a patient's visit, [the physician must] select codes that best represent the services furnished during the visit."  In addition, "it is the provider's responsibility to ensure that the submitted claim accurately reflects the services provided."  "The volume of documentation should not be used to determine which specific level of service is billed."

**D.    The CMS Definition of Initial and Subsequent Observation and Inpatient Care**

47.    Billing for initial and subsequent observation and inpatient care involves an analysis of three key components, patient history, patient examination, and medical decision-making.  "Because the level of [evaluation and management] service is dependent on two or three key components, performance and documentation of one component (*i.e.*, examination) at the highest level does not necessarily mean that the encounter in its entirety qualifies for the highest level of [evaluation and management] service."  1997 Documentation Guidelines for Evaluation and Management Services, at 4.

### 1.    Initial Observation Care

48.     The Medicare Claims Processing Manual provides that "[o]bservation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment, that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital.  Observation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge." Medicare Claims Processing Manual, § 30.6.8(A).

49.     Providers must satisfy the evaluation and management documentation guidelines for furnishing observation hospital care.  Medicare Claims Processing Manual, § 30.6.8(C).

50.     When a patient receives observation care for less than 8 hours on the same calendar date, the physician codes the visit using the Initial Observation Care codes, CPT code 99218-99220.  Medicare Claims Processing Manual, § 30.6.8(B).

51.     CPT codes 99218, 99219, or 99220 have the following definitions:

52.     CPT 99218 is initial observation care for the evaluation and management of a patient involving the following three key components:

- A detailed or comprehensive history;
- A detailed or comprehensive examination;
- Medical decision-making that is straightforward or of low complexity.

53.     CPT 99219 involves the following three key components:

- A comprehensive history;

- A comprehensive examination;
- Medical decision-making that is of moderate complexity.

54.   CPT 99220 involves the following three key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision-making that is of high complexity.

**2.   Initial Inpatient Care**

55.   A hospitalist may code a patient's initial hospital care using CPT codes 99221, 99222, or 99223.  These codes have the following definitions:

56.   CPT 99221 involves the following three key components:

- A detailed or comprehensive history;
- A detailed or comprehensive examination;
- Medical decision-making that is straightforward or of low complexity.

57.   CPT 99222 involves the following three key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision-making that is of moderate complexity.

58.   CPT 99223 involves the following three key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision-making that is of high complexity.

### 3.    Same Day Observation or Inpatient Care

59.    When a patient receives observation or inpatient care for a minimum of 8 hours, but less than 24 hours, and is discharged on the same calendar date, the physician codes the visit using the Observation or Inpatient Care Services codes, CPT code 99234-99236.  Medicare Claims Processing Manual, § 30.6.8(B).

60.    CPT codes 99234, 99235, or 99236 have the following definitions:

61.    CPT 99234 is observation or inpatient hospital care for the evaluation and management of a patient, including admission and discharge on the same date, involving the following three key components:

- A detailed or comprehensive history;
- A detailed or comprehensive examination;
- Medical decision-making that is straightforward or of low complexity.

62.    CPT 99235 involves the following three key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision-making that is of moderate complexity.

63.    CPT 99236 involves the following three key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision-making that is of high complexity.

### 4.    Subsequent Inpatient Care

64.    A hospitalist may code a patient's subsequent hospital care using CPT codes 99231, 99232, or 99233.  These codes have the following definitions:

65.     CPT 99231 involves the following three key components:

- A problem focused interval history;

- A problem focused examination;

- Medical decision-making that is straightforward or of low complexity.

66.     CPT 99232 involves the following three key components:

- An expanded problem focused interval history;

- An expanded problem focused examination;

- Medical decision-making that is of moderate complexity.

67.     CPT 99233 involves the following three key components:

- A detailed interval history;

- A detailed examination;

- Medical decision-making that is of high complexity.

**E.     The CMS Documentation Requirements for Initial and Subsequent Hospital Care**

**1.     Documentation of History**

68.     The level of evaluation and management services a physician may code is based in part on the extensiveness of the patient history he or she takes.  There are four types of history, Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive.  In order to code a visit at the highest level (*i.e.*, 99220, 99223, 99226, 99233, or 99236), the history the physician takes from the patient and records on the patient's chart must be Comprehensive.

69.     Each type of history includes some or all of the following elements:

- chief complaint;

- history of present illness;

- review of systems; and

- past, family, and/or social history.

70.    Only if the physician (i) takes an *extended* history of the patient's present illness and (ii) performs a *complete* review of body systems and a *complete* past history is the overall history deemed Comprehensive.  Only in this instance may the physician code a visit at the highest level.

71.    To determine whether the physician has taken the types of history that qualifies for coding at a lower or higher level, he or she (as well as any auditor) must follow concrete, easy-to-follow criteria, which are set out in the 1997 Documentation Guidelines.

72.    There are eight elements of a present illness that a physician can assess, things such as duration, location, and severity.  An *extended* history of present illness occurs when the physician considers and documents at least four of these elements.

73.    A review of body systems is a series of questions the physician asks to identify signs or symptoms of illness.  A *complete* review of systems inquires about the systems directly related to the problems identified in the history of present illness, plus all additional systems. The physician must document review of at least ten organ systems to qualify for a complete review of systems.

74.    A past history is a patient's past experiences with illnesses, operations, injuries, and treatments.  A family history is a review of medical events in the patient's family.  A social history is an age appropriate review of past and current activities.  A *complete* past, family, and/or social history generally requires a review of all three history areas (although in limited circumstances a review of two history areas will suffice).  A physician must document at least

one specific item from each of the three history areas to take a complete past, family, and/or social history.

### 2.    Documentation of Examination

75.    As with the patient's history, the levels of evaluation and management services provided are based in part on four possible types of physical examination, Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive.  In order to code a visit at a higher level (*e.g.*, 99223 or 99233), the examination the physician conducts and records on the patient's chart must be Comprehensive.

76.    A Problem Focused examination is a *limited* examination of the affected body area or organ system.  An Expanded Problem Focused examination adds a limited review of any other symptomatic or related body areas or organ systems.

77.    A Detailed examination is an *extended* examination of the same body areas and symptoms as an Expanded Problem Focused examination.  Finally, a Comprehensive examination is a general multi-system examination, or a complete examination of a single organ system and other symptomatic or related body areas or organ systems.

78.    The 1997 Documentation Guidelines identify eleven body or organ systems that are included in a general multi-system examination.  They are:  cardiovascular; ears, nose, mouth, and throat; eyes; genitourinary (male or female); hematologic/lymphatic/immunologic; musculoskeletal; neurological; psychiatric; respiratory; and skin.

79.    The 1997 Documentation Guidelines provide further guidance on the elements of an examination of the body systems identified above.  These elements are identified in a chart, in bullets.  Thus, for example, the possible elements of an eye examination performed as part of a general multi-system examination are:

- Inspection of conjunctivae and lids;
- Examination of pupils and irises;
- Ophthalmoscopic examination of optic discs.

80.     The 1997 Documentation Guidelines provide physicians very specific directives for determining the difference between a Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive physical examination.  The complexity of the coding level is dictated by the extensiveness of the examination.

81.     Thus, a Problem Focused examination involves – and must include documentation of – less than six elements identified by bullet.  An Expanded Problem Focused examination must involve and document at least six elements or bullets.  A Detailed examination must involve and document either at least two elements from each of six body areas or systems or at least twelve elements in two or more areas/systems.  Finally, a Comprehensive multi-system examination must involve *all* elements in at least nine organ systems and document at least two elements from all nine or, for a single organ system examination, *all* elements of that system.

82.     In short, if a physician performing a multi-systems examination has not examined *all* listed elements in at least nine organ systems and documented at least two elements from each, he or she may not use a code that requires a Comprehensive examination.  Likewise, if the physician is performing a single-system examination, he or she must examine and document *all* elements of that system to use a code requiring a Comprehensive examination.

### 3.     Documentation of the Complexity of Medical Decision-Making

83.     The final factor that determines the levels of evaluation and management services provided is the type of medical decision-making required by the patient encounter.  The 1997

Documentation Guidelines recognize four types of medical decision-making – straight-forward, low complexity, moderate complexity, and high complexity. In order to code a visit at a higher level (*e.g.*, 99223 or 99233), it must involve high complexity medical decision-making.

84.    Three measures contribute to the complexity of medical decision-making. They are the number of diagnoses or management options the physician considers; the amount of complexity of data the physician must review; and the risk presented by the patient's condition. Only two – not all three – of these measures must match the level of decision-making the physician assigns in determining the proper code.

85.    Thus, for medical decision-making to be considered of low complexity, two of these three measures – number of diagnoses, complexity of data, and risk – would be limited or low. In contrast, for medical decision-making to be considered of high complexity, two of the three measures would be extensive or high. Further, the physician must document this.

86.    The first measure is the number of diagnoses or management options the physician considers. This is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. For each patient encounter, the physician is required to document an impression or diagnosis, treatment decisions, and referrals or consultations requested.

87.    The second measure is the amount or complexity of data the physician must review. This is based on the types of diagnostic testing ordered or reviewed. A decision to obtain and review old medical records or obtain history from a source other than the patient increases the amount and complexity of data to be reviewed. The 1997 Documentation

Guidelines require the physician to document tests ordered, labs reviewed, and physician analyses of such information.

88.     The third measure, risk of significant complications, morbidity, or mortality, is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.  The physician is required to document co-morbidities and surgical or invasive procedures planned or scheduled to justify high-risk medical decision-making.

**F.      The CMS Definition and Coding of Discharge Management Services**

89.     "Hospital Discharge Day Management Services, CPT Code 99238 or 99239 is a face-to-face evaluation and management (E/M) service between the attending physician and the patient."  Medicare Claims Processing Manual, § 30.6.9.2(B).

90.     A physician uses CPT code 99238 for discharge encounters less than 30 minutes and 99239 for discharge encounters greater than 30 minutes.  These codes include (as appropriate):   final examination of the patient; discussion of the hospital stay (even if the time spent by the physician on that date is not continuous); instructions for continuing care to all relevant caregivers; and preparation of discharge records, prescriptions, and referral forms.

**G.      The CMS Definition and Coding of Critical Care Services**

91.     "Critical care is defined as the direct delivery by physician(s) medical care for a critically ill or critically injured patient.  A critical illness of injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition."  Medicare Claims Processing Manual, § 30.6.12(A) (underlining in original).

92.     For a physician to code a patient encounter using a critical care code, "[c]ritical care services must be medically necessary and reasonable." Medicare Claims Processing Manual, § 30.6.12(B). Critical care codes may not be used where the services provided "do not meet critical care services or [are] provided for a patient who is not critically ill or injured …." *Id*. "Providing medical care to a critically ill patient should not be automatically deemed to be a critical care service for the sole reason that the patient is critically ill or injured." *Id*.

93.     Critical care involves "high complexity decision making to assess, manipulate, and support vital system functions … to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient's condition." Medicare Claims Processing Manual, § 30.6.12(A). "Providing care to a critically ill, injured, or post-operative patient qualifies as a critical care service only if both the illness or injury and the treatment being provided meet the above requirements." *Id*.

94.     "For any given period of time spent providing critical care services, the physician must devote his or her full attention to the patient and, therefore, cannot provide services to any other patient during the same period of time." Medicare Claims Processing Manual, § 30.6.12(C).

95.     Once the above requirements are met, the appropriate critical care code depends on the amount of time the physician provided critical care services. "The duration of critical care services to be reported is the time the physician spent evaluating, providing care and managing the critically ill or injured patient's care." Medicare Claims Processing Manual, § 30.6.12(C).

96.     "Critical care is a time-based service, and for each date and encounter entry, the physician's progress note(s) shall document the total time that critical care services were provided." Medicare Claims Processing Manual, § 30.6.12(E).

97.     CPT Code 99291 is used to report the first 30-74 minutes of critical care on a given calendar date of service.  CPT Code 99292 is used to report additional blocks of time, of up to 30 minutes each beyond the first 74 minutes of critical care.  Medicare Claims Processing Manual, § 30.6.12(f).  "Critical care of <u>less than 30 minutes total duration on a given calendar date</u> is not reported separately using the critical care codes." *Id.* (underlining in original).  Time counted towards critical care services may be continuous or intermittent and aggregated in time increments, as long as it is provided on a single day.  *Id.*

## V.     FACTUAL BACKGROUND

### A.     Background

98.     Hospitalists are hospital-based general physicians.  Hospitalists assume the care of hospitalized patients in the place of patients' primary care physicians.

99.     In 2005, Drs. Brent Herr and Mark Joy were hired by the owner of Yakima Regional, national hospital company Health Management Associates ("HMA"), to join HMA and form a hospitalist group at Yakima Regional.  In the succeeding two years, Dr. Maiocco and Dr. Kirschner, among other doctors and nurse practitioners, joined the hospitalist group.  All were employees of HMA.

100.    In spring 2009, Yakima Regional's CEO announced that the hospitalist group was not operating efficiently and that the hospital would hire a national hospitalist company to operate the hospitalist program.  In or about late 2009, HMA entered into a contract with Apogee

to manage Yakima Regional's hospitalist program.  On March 1, 2010, Drs. Kirschner, Herr, Joy, and Maiocco chose to remain at Yakima Regional and became Apogee employees.

101.    In or about May 2010, Apogee named Dr. Laurence Young as director for the West/Southwest regional division, and Yakima Regional was assigned to be within this division. Apogee made Kirschner and Joy co-directors of the hospitalist program at Yakima Regional.

102.    In a November 3, 2010 e-mail from Young to Yakima HMA executives Richard Robinson (Regional CEO) and Cindi Butcher, Young announced that a new Apogee hospitalist, Dr. Jaime Upegui, would become Co-Program Director at Yakima Regional with Kirschner. Kirschner thereafter was responsible for outreach, patient satisfaction, and medical education. Upegui was given responsibility for "all other program leadership responsibilities including but not limited to:  scheduling to include keeping the FTE count to at or below that approved by the hospital (currently 7.0 FTEs); quality including core Measures, Clinical Pathways and quality indicators; safety; value including LOS, DQ, Market Share, relationship with ED and consultants, and hospital committee assignments; and coding compliance/average charge per encounter.  This is primarily the financial and performance aspects of our mission."

103.    Conflicts erupted immediately between the hospitalist group, which previously had been relatively self-governed, and Apogee.  The conflict that led to the instant dispute involved coding and charge per encounter requirements.  The nub of the Relators' dispute is that Apogee pressured all of its hospitalists to exaggerate and falsify their documentation of patient visits to justify higher-level (and more lucrative) billing codes, a form of upcoding.

B.     **Apogee Coerced Its Hospitalist Employees to "Upcode"**

1.     **Apogee Pressured Its Hospitalists to Bill at the Highest-Level Codes and Misrepresented "National Averages" to Increase the Pressure**

a.     **Apogee required hospitalists to conform to percentage requirements for billing at the highest-level codes**

104.   In an e-mail dated July 15, 2010, Young provided Kirschner with a memorandum entitled "The 5 Pillars of Financial Performance." Apogee's "5 Pillars" cemented the impression that Apogee's profit model was to pressure its hospitalist employees to upcode rather than to code at levels supported by medical necessity. The "5 Pillars" identified by Young were:

1.  case-mix index (a measure of severity of illness);
2.  length of stay;
3.  ED admit rates;
4.  average charge per encounters; and
5.  encounter volume.

105.   Young's "5 Pillars" memo set out bluntly that Apogee hospitalists were expected to code at the highest levels for A high percentage of evaluation and management services regardless of medical necessity.

106.   Young stated: "Derik Brown shared with the team each person[']s CPT distribution. Codes 99223 and 99239 both should be 80%. 99233 should be 50%." He later reiterated: "Yakima CPT Distribution: 50th percentile for each group should be 99233 [sic] (80%), 99233 (50%), 99239 (80%)." Apogee called these highest-level coding requirements business "metrics."

b.     **Apogee lied to hospitalists about national averages for the use of highest-level codes**

107.   To pressure the Yakima physicians to upcode, Young lied to them about the "national average" for physician coding at the highest level. In an April 16, 2011 e-mail, Young wrote Herr that "you are below the norm. The national average for 99239 billing is about 80%."

In fact, Medicare data for 2007 showed that the national average for physicians billing at CPT code 99239 was 39% – less than half of what Young claimed. (2007 is the most recent year for which published Medicare averages are available.) Young's upcoding pressure tactics did not stop with this statement. He wrote that because patients in Yakima supposedly were sicker than average patients, "[o]ne would suspect that … if you are taking care of sicker patients *all of your major high level codes would be higher than the national average*" (emphasis added).

108.   Medicare published the national distribution of CPT codes for the codes at issue in this case from 2007 data. Medicare's data shows that Apogee's metrics significantly exceed national standards, as shown below.

| CPT Code | National Average | Apogee Metric | Delta |
|---|---|---|---|
| 99223 | 68% | 80% | +12% |
| 99233 | 25% | 50% | +25% |
| 99239 | 39% | 80% | +41% |

109.   Paralleling Apogee's effort to pressure its employees code at the highest levels, Young's memo declared a new and higher standard for the Yakima hospitalists' average charge per encounter with patients. He stated: "[a]verage charge/encounter of each team member will improve to the Apogee national norm. ($100)."

**c.   Apogee's use of highest-level codes far exceeded national averages**

110.   Apogee's hospitalists coded at the highest levels far in excess of the national average.

111.   The tables below portray Apogee's internal coding data for all hospitalists in its Division I for 8 months in 2010 and 2011. The tables show the percentage use of the highest-level codes for initial and subsequent visits and discharges for 7 of the 10 largest Apogee

hospitalist practices in Division I from June 2010 to March 2011 (omitting November 2010 data, which is not available to Relators).  The last column below (highlighted in red) shows the percentage in excess of the national Medicare average that Apogee hospitalists used the highest-level codes.

Fort Smith, AK

| | Natl. Avg. (2007) | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 69% | 65% | 74% | 74% | 81% | 84% | 81% | 80% | 76% | |
| 99233 | 25% | 34% | 23% | 36% | 48% | 55% | 47% | 45% | 49% | 42% | |
| 99239 | 39% | 57% | 62% | 80% | 79% | 79% | 85% | 86% | 90% | 77% | |

Slidell, LA

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 83% | 90% | 88% | 90% | 87% | 89% | 94% | 90% | 89% | |
| 99233 | 25% | 72% | 88% | 80% | 80% | 82% | 85% | 86% | 76% | 81% | |
| 99239 | 39% | 89% | 94% | 93% | 96% | 93% | 94% | 91% | 95% | 93% | |

Yakima, WA

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 64% | 78% | 81% | 80% | 88% | 85% | 87% | 77% | 80% | |
| 99233 | 25% | 67% | 46% | 57% | 51% | 69% | 64% | 60% | 58% | 59% | |
| 99239 | 39% | 32% | 52% | 48% | 49% | 76% | 70% | 73% | 76% | 60% | |

Las Cruces, NM

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 94% | 0% | 97% | 97% | 97% | 96% | 88% | 94% | 83% | |
| 99233 | 25% | 84% | 12% | 74% | 81% | 83% | 81% | 64% | 67% | 68% | |
| 99239 | 39% | 90% | 89% | 87% | 97% | 92% | 96% | 93% | 96% | 92% | |

Medford, OR

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 83% | 85% | 90% | 89% | 85% | 89% | 92% | 92% | 87% | |
| 99233 | 25% | 54% | 82% | 67% | 72% | 66% | 65% | 64% | 69% | 67% | |
| 99239 | 39% | 98% | 94% | 96% | 98% | 98% | 93% | 92% | 93% | 95% | |

Carlsbad, CA

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 94% | 95% | 96% | 92% | 95% | 96% | 89% | 87% | 93% | |
| 99233 | 25% | 36% | 32% | 39% | 49% | 40% | 35% | 26% | 33% | 36% | |
| 99239 | 39% | 94% | 94% | 90% | 92% | 92% | 95% | 81% | 84% | 90% | |

College Station, TX

| | Natl. Avg. | 6/10 | 7/10 | 8/10 | 9/10 | 10/10 | 12/10 | 2/11 | 3/11 | Facility Avg. | Diff. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 99223 | 68% | 98% | 100% | 99% | 94% | 89% | 94% | 93% | 93% | 95% | |
| 99233 | 25% | 87% | 93% | 96% | 88% | 87% | 76% | 89% | 86% | 88% | |
| 99239 | 39% | 99% | 99% | 100% | 98% | 100% | 87% | 89% | 95% | 96% | |

### d.   Apogee deliberately ignored the data it collected showing hospitalist upcoding

112.   Apogee required its Hospitalist Program Directors to perform monthly audits of individual doctor's compliance with CMS documentation requirements for the highest-level codes they used.  Apogee maintained a computer program that allowed its executives to review aggregated statistics for hospitalist coding compliance for the highest-level codes, by physician and hospital.  Its computerized program produced a monthly "Apogee Hospitalist Report Card" and "CEO Report Card" that contained coding compliance statistics.

113.   The data generated by Apogee's monthly coding audits painted a grim picture of Apogee hospitalists' compliance with documentation requirements when using the highest-level

codes. The audits showed that for a substantial percentage of Apogee hospitalists' patient encounters coded at the highest-levels, the highest-level code was improper.

114. In July 2010, for example, according to the "CEO Report Card" for Yakima, the Yakima Program Director had determined that only 60% of Yakima hospitalists' encounters coded at the highest level were proper. The audit results suggested that the remaining 40% should not have been reimbursed at the highest level. Further, the "Report Card" indicated that Yakima's compliance rating ranked it 40th of the approximately 70 hospitalist programs that Apogee administered at the time. This meant that a full 43% of Apogee's hospitalist programs had compliance rates under 60%.

115. In September 2010, Yakima's Program Director determined that 75% of Yakima hospitalists' encounters coded at the highest level were proper. Apogee's "CEO Report Card" ranked Yakima at 26th of Apogee's approximately 70 hospitalist programs in coding compliance. This meant that nearly two-thirds of Apogee's hospitalist programs had compliance rates of under 75% for their highest-level claims.

116. Apogee's own computerized data showed that a substantial percentage of its hospitalists' highest-level claims were improper. Despite this information, Apogee did not report to the government that its data showed persistent improper coding for its highest-level claims. It did not submit itself for an audit or offer any reimbursement for the overpayments. Apogee continued to seek reimbursement for all claims coded at the highest levels. And the United States and the States continued to pay Apogee for its improperly coded claims.

2.      **Apogee Enforced Its Highest-Level Coding Requirements by Monitoring and Counseling Non-Compliant Hospitalists**

117.    At the end of his "5 Pillars" memo, Young cemented the coding distribution and average charge per encounter requirements by announcing that he would be watching the Yakima hospitalists' coding distributions.  To ensure compliance with Apogee's directives, Young wrote that "I will check average charge for the group every two weeks" and "I will check each team members [sic] average charge and their CPT comparisons monthly."

118.    Once Apogee installed Upegui as co-Program Director for the Yakima Regional program, Upegui also began to pressure the hospitalists to upcode to meet Apogee's coding distribution metrics.  In an e-mail dated March 5, 2011, Upegui counseled Herr on increasing his discharge codes from 99238 to 99239 and his subsequent care codes from 99232 to 99233.

119.    For subsequent care encounters, Upegui asserted that Herr should code the visits at the highest level because the initial visits were coded at the highest level, regardless of the medical necessity.  "The other one is the 232, if you admitted most of your patients as 223 then it should not drop that much the next day on follow up."  He added, "[r]emember these are the things that bring the collections up and supports us from a financial point of view."

120.    Upegui also pressured Herr to either upcode his discharges or spend the requisite time with the patient, even if not medically necessary, to justify the highest level discharge code.  "I got the CPT stats for the group and on [discharges] you are doing all of them as 238.  Let me know what your concerns are about making the number a bit higher ...."  Upegui listed all of the tasks that could be combined when coding discharges and stated, "so most of the time we do spend more time then [sic] 30 minutes on discharge."  (99339 is the proper code when the physician's discharge of the patient consumes more than 30 minutes.)

121.    Young also put pressure on Herr to upcode.  In the same e-mail in which Young lied to Herr about the "national average" for physicians using CPT code 99339, he volunteered a game plan for how to spend more than 30 minutes on discharges:  "One could also assume that the time spent in arranging discharges; talking with nurses, case manages, therapists, patient and families discussing discharge goals, needs and plans, talking with PCPs and/or accepting physicians, reviewing the chart, labs, and diagnostic studies in preparation for discharge, examining the patient on the day of discharge, filling out the forms, writing scripts and instructions, and dictating the discharge summary would take over 30 minutes of cumulative time starting when you first saw the patient for admission."

122.    Herr disagreed "that most of my discharges should qualify as a level [99339] based on the actual minutes I can recall being actively involved in the discharge process for my patients over the years."

123.    Discharges typically are handled in less than 30 minutes, which is why CMS authorizes a higher payment *only* for discharges requiring longer than 30 minutes.  At time of discharge, the physician has seen the patient for many days and knows the patient's symptoms have cleared, and the patient knows he or she is to be discharged.  The physician typically has little need to advise the patient other than to finish medications and make an appointment for follow-up.  If there is a post-discharge course of medicine, it takes the physician moments to write a prescription.

124.    Physicians also typically require little time for post-discharge treatment plans. They review medications and write or dictate orders, which takes a short time; they do not sit at a phone and implement the orders themselves.  For example, a plan with a social worker actually

involves writing an order: "social worker to find nursing home placement." A hospital staff member makes the call to set up a stress test; again, the physician merely writes an order. These steps are part of the discharge orders written by the physician, and in the typical case writing (or dictating) discharge orders takes 10 minutes or less, not 30 minutes.

125.   Dr. Joy challenged Apogee's Director of Quality and Compliance Peter Thompson on this issue as well. At a face-to-face meeting with Thompson, Joy asked if Apogee had a mechanism for evaluating physicians who always charged at the highest admit and discharge codes. Joy pointed out that at times patients were in the hospital for less than 24 hours, and they typically did not need a lengthy discharge process. Thompson refused to answer Joy's question.

126.   Young pressured individual physicians to code at the highest levels regardless of medical necessity. In an e-mail dated April 2, 2011 to Kirschner, Young asserted that Joy and another doctor were undercoding and directed that they must justify to him why their patients did not meet criteria for coding at the highest level. Without knowing the condition of the patients the physicians treated, and based instead on the physicians' average charge per encounter, Young accused the two doctors of "being unwilling to write compliant notes, then charging for a lesser level of care."

127.   Young wrote that Joy and Dr. Bhavya Gopalagwda were "undervaluing themselves. This level of charges would be appropriate for a mid-level. I'm sure that at this [sic] stage they know how to write a note. Are they not providing the service?"

128.   Young then stated that he would closely monitor the two physician's coding decisions. If they did not code at the highest level, they would need to explain the reason to him.

He wrote the Kirschner: "For the next three months will you ask your PIC to send me all of their [Joy's and Gopalagwda's] level 2 and level 1 notes H&Ps, Progress notes) [sic]. They will need to explain why their patients did not meet criteria for level three care."

129.    But high codes are assigned because of medical necessity, not the experience level of the physician. There is no correlation between experience and high-level codes. Young's implication is that because a doctor is more experienced, he or she can pad the chart better.

130.    On April 12, 2011, Upegui repeated his pressure on the Yakima hospitalists to upcode their initial visits. "The idea of this is to document what you do and be able to bill for it. Again, you are NOT saying the patient is sicker or not, what you are documenting is that you DID the work and getting the reimbursement for it. The expectation is to have 80 to 85% of your charges as high level charges because that is the expected quality of our work we want for our team and for the patients. 221 and 222 are not less sick patients they are notes which have less of our work …."

131.    Upegui's final sentence quoted above demonstrates Apogee's pattern and practice of falsifying documentation to justify a high-level code. Encounters charged at code 99223 *are* with sicker patients, and encounters charged at 99221 and 99222 are with less sick patients. Apogee's practice ignores that the medical necessity requirement obligates physicians to bill at the lowest level of evaluation and management services that is warranted. Medicare Claims Processing Manual, § 30.6.1(A).