3.     **Apogee Enforced Its Highest-Level Coding Requirements by Threatening to Fire Non-Compliant Hospitalists**

132.   Apogee applied its coding distribution metrics as a condition of employment. Young monitored the Yakima physicians' coding distributions and threatened Herr and Joy with termination for cause if they refused to satisfy Apogee's metrics.

133.   In response to Herr's resistance to Apogee's upcoding pressure and heavy-handed management, Young delivered Herr an ultimatum. In an e-mail dated April 16, 2011, Young demanded that Herr start "being a team player," which (he wrote) meant "improving the metrics which Apogee measures to assess the performance of the program." If Herr did not, he would be fired. "You have agreed to either confirm your commitment to the Apogee-Yakima team's success in all of its goals, or provide me with your 60- day termination notice by 12 noon on Monday 4/18/2011. If you confirm your commitment to the Apogee-Yakima team, but you [sic] behavior does not meet expectations, you will be terminated for cause."

134.   On the same day, Young sent the same e-mail to Joy.

135.   On April 17, 2011, Young repeated Apogee's policy that failure to meet metrics is a ground for disciplinary action. "[I]f a team is markedly below the national average, or within a team, one or more individuals are markedly below the rest of the team, then corrective action will be necessary."

4.     **Apogee Pressured Its Hospitalist Employees to Over-Document to Justify Upcoding**

a.     **Apogee's business model focused on documentation, not medical necessity**

136.   As part of Apogee's profit model, it pressured its employees to falsify documentation to justify upcoding. Apogee sponsored an educational program for new hospitalists called "Apogee University," and the written materials from the training program

accurately stated CMS's coding requirements. But in practice Apogee induced its employees to either falsify their documentation or provide unnecessary care that would allow the physician to "check off the boxes" needed to code at the highest level.

137.    Apogee executives clearly grasped that a physician's documentation alone dictated insurance reimbursement. The Medicare Act and CMS guidelines stated that medical necessity was the touchstone for reimbursement. But CMS never had the resources to examine each patient's entire medical file for medical necessity when approving reimbursement at the code charged by the physician. Absent an expensive and time-consuming audit, the best auditors can do is to compare the doctor's chart notes to the code selected. Hence Apogee obsessively emphasized to its hospitalists to document the assumedly "high-level care" they provided – while remaining silent on medical necessity.

138.    In Young's initial "5 Pillars" communication, he introduced the Apogee message that documentation, not medical necessity, is king. Apogee assumed that patients were almost always sick enough to warrant the highest-level codes. Therefore, hospitalists needed only to document their "work," not consider medical necessity. As Young described the new Apogee regime at the outset, "[t]eam members will learn how to code correctly to account for the amount of work expended taking care of the patient, and then to document correctly to support the code used."

139.    Yakima Program Director Upegui echoed Apogee's exclusive focus on documentation. After a Yakima hospitalist team meeting on April 7, 2011, in Kirschner's presence, Upegui bragged about how easy it was to get away with fabricating documentation.

Upegui stated to her that he could make a mere "hangnail a level 3 admit," adding "*your documentation stands alone.*"

140.    Falsification of documentation led particularly to the fraudulent use of the critical care CPT code, 99291.  It is easier to document a critical care visit than an initial hospital visit. Apogee executives advocated to hospitalist employees that they use a critical care code, which resulted in higher reimbursement, rather than an initial visit code, even when the patient's condition did not warrant it.

141.    In early January 2011, Upegui recommended this fraudulent conduct in a team meeting in Kirschner's presence.  Young had told Upegui that CPT code 99291 was the easiest code to charge for, and that physicians could easily write a critical care note even if the patient were not critically ill.  Young told Upegui that Dr. Xiongying Chen, a hospitalist in Montgomery, Alabama, did this and was among the highest billers in the company.  During this period, internal Apogee data listed Dr. Chen as 13th in the entire company in total monthly billings.

142.    On January 13, 2011, Kirschner entered in her contemporaneous log of written notes the following:

> Dr. Upegui on 1/12/12 stated he spoke to Larry Young.  99291 ICU is the easiest code to charge for.  The patient may not be critical but it is possible to write a critical care note.  Dr. Chen at program X Montgomery AL who charges the most in Apogee history does this.

### b.    Apogee's "Program Director Audits"

143.    Apogee developed elaborate auditing tools to review hospitalist coding.  While seemingly a laudatory practice, these tools actually were designed and used to drive hospitalists to bill at the highest-level codes regardless of medical necessity.

144.    Apogee required Program Directors at the hospitals it contracted with to perform monthly audits of the codes used by each hospitalist.  Apogee created PowerPoint presentations that outlined how Program Directors were to perform these monthly audits.  Tellingly, these presentations did not mention the words "medical necessity."  They also made clear the Apogee directed its Program Directors to audit and counsel hospitalists only on how to properly document the highest-level codes.  Program Directors did not audit or advise hospitalist employees on whether their documentation of lower-level codes was compliant.  Lower-level codes were not an Apogee concern.

145.    Apogee provided its Program Directors with a "Coding and Compliance Resource Kit" that gave them step-by-step guidance for auditing hospitalists' coding.

146.    The Coding and Compliance Resource Kit listed the criteria for charging initial, subsequent, critical care, and discharge visits; an audit questionnaire with yes/no boxes for each element required for the code; and an audit form to record the compliance of the physician's code selection with CMS requirements.  *However, Apogee's audit tool only covered the highest-level code.  It was carefully designed to prompt Program Directors only to evaluate the hospitalist employee's compliance when coding at the highest level.*

147.    The Resource Kit was not designed to guide Program Directors to ensure the code used and the service provided was medically necessary.  Illustrating Apogee's profit model, the Coding and Compliance Resource Kit also did not contain the words "medical necessity."  The tool Apogee provided its Program Directors to ensure hospitalists' compliance with CMS requirements did not mention the single-most important criteria for reimbursement.

148.    Apogee required Program Directors to complete one audit per code, per physician, only for the following CPT codes: 99223, 99233, 99291, and 99239. For each encounter, Apogee's Hospitalist Program Director was required to review the doctor's documentation against the checkbox form in the Resource Kit. They could perform these tasks through an online tool. The Director then counseled hospitalists on whether their documentation contained each of the elements required to support the highest-level code. If a physician's chart notes did not, the Program Director would remind the physician of the missed elements and counsel the physician on how to make the documentation match the code.

149.    The audit tool operated as a pressure tactic to drive hospitalists to document for coding at the highest levels, while it wholly ignored medical necessity. For example, Upegui coached Yakima hospitalists on using "code words" in their documentation to justify charging the highest-level codes. He did this in addressing CPT code 99223, the highest-level initial visit code.

150.    On February 10, 2011, Upegui sent Herr an e-mail that said: "[I]f you state high risk, worsening, severe or critical it also helps to cover the 223 code." Likewise, on the same day he sent an e-mail advising Joy: "If possible state the words high risk, critical, acute, worsening or severe in the assessment or plan." This advice matched Apogee's Program Director "Audit Tool," which contained a check-box to prompt Directors to encourage their hospitalists to "mention ... high risk or [use] words such as severe, worsening, critical ...." The Yakima hospitalists also was coached to state that inpatients were at risk of decompensation until discharge, even when the chronic conditions they had were stable or well-compensated.

c.  **Apogee's "Pocket Guide"**

151.  Apogee's intentional de-emphasis of medical necessity was also reflected in the "Pocket Guide" it gave every hospitalist to guide their treatment of patients. Apogee gave every hospitalist a small pocket guide, called the "blue book," to read and use as a reference for how to provide excellent care to patients. The Pocket Guide contained a section on coding. Again, nowhere in the Pocket Guide did Apogee mention medical necessity. Meeting medical necessity in choosing the proper code was not a priority Apogee raised with its hospitalists.

152.  Apogee's business model of coding to profit rather than medical necessity was captured in a column in Apogee's employee newsletter written by its number three in command, Chief Medical Officer Peter W. Thompson, M.D. Thompson aptly entitled his June 2011 column "The Storytellers."

153.  Thomson encouraged Apogee's hospitalists to be better "storytellers." In his column, Thompson expressed his documentation expectations to Apogee clinical staff:

> Patients are very sick and hospital stays are short these days. A lot happens in a short period of time …. Our billing comes from our documentation, but our documentation comes from telling the story of the patient in front of us. Use of "high level codes" is appropriate only when the patient requires high level care …. So, in the end, with the patient in front of us, and at the head of the wider health care team, we are storytellers. Let's always tell the most complete, and compliant story for our patients' benefit!

154.  In an e-mail to clinical staff circulating his article, Thompson again exhorted them to use high-level codes. He wrote: "We do high level work and lots of it; the patients are sick, and we merely need to document what we do, by the rules, then value our care appropriately."

5.   **Apogee Pressured Hospitalists to Recruit Patients From the Emergency Room**

155.   On June 10, 2010, shortly after Apogee assumed management of the Yakima

Regional hospitalist program, Division Director Young provided Kirschner a "Yakima Action

Plan." The "Action Plan" made clear that Apogee's overriding objective was to turn a profit,

even at the cost of compliance with medical necessity requirements.

156.   The directive stated bluntly that "we need to increase the average census per

physician." To achieve this, Young directed the Yakima hospitalists to troll for patients in the

emergency department. He instructed that when patient census drops below 15, the hospitalists

should go to the emergency department ("ED") and "ask[] for admissions." If the hospitalists

got "one more admit per doc daily…, [y]our hospital CEO will be singing your praises."

157.   In a December 2010 team meeting, Apogee's Program Director at Yakima

Regional, Upegui, prepped the hospitalists on how to falsely justify the admission of a patient

where medical necessity was lacking. On December 15, 2010, Kirschner recorded in her notes

as follows:

> 12/15 At meeting today, Dr. Upegui stated it was easy to make
> someone inpatient, just give them 125 mls of fluid per hour instead
> of 120. Similarly, if you're treating pain, just give IV narcotics.
> Witnesses Dr. Bhavia, Dr. Silverstein. Of course do what's best
> for the patient. Sandy also present.

158.   Hospitalists' "[a]sking for admissions" is improper for several reasons. One

reason is that it leads to the admission of patients without the required medical necessity.

Emergency departments are supervised and staffed by emergency medicine physicians who are

trained on the circumstances warranting a patient's admission to the hospital. The purpose of

Young's directive was to place Apogee's hospitalists in the position of influencing ED

physicians to admit patients when they otherwise would not, and thereby to "increase the average census per physician."

159.    Kirschner objected to Apogee's ED trolling policy. In a June 24, 2010 e-mail to Young and two other Apogee executives, Peter Thompson and Steve Cervi-Skinner, Kirschner wrote, "[i]n times of the RAC audits, [and] high costs of medical care in general I feel this puts us on a slippery slope."

160.    Apogee, and Young in particular, ignored Kirschner's concerns. In a June 26, 2010 e-mail, he repeated his instruction to Kirschner: "If you and your team are physically present several time[s] daily asking how can you make their life easier, the increased admissions will come."

161.    On July 26, 2010, Young wrote to Kirschner that the Yakima hospitalist program was "-3.6 below goal" in its "encounter volumes, *i.e.*, Apogee's target for numbers of patients/day the hospitalists see. He stated, "[y]ou are just about at the ... trigger point for starting ED rounds 3X daily...."

162.    On August 3, 2010, Apogee announced that its policy of hospitalists visiting emergency departments to recruit patients for hospital admission was an Apogee "Best Practice." Apogee called the patient recruitment device "ED Rounding" or "ER Rounding." Apogee Chief Medical Officer Peter Thompson announced that the practice "has been identified as a priority by the Senior Leadership Team and [Apogee Chief Executive Officer] Dr. Gregory and we are moving rapidly to roll this out." Thompson stated that "a Best Practice is rounding in the ER to help properly disposition patients." He emphasize that Apogee hospitalists should be doing this "when our census is low."

163.    Thompson announced that Apogee had developed a monitoring tool to ensure that Apogee executives could track hospitalists' ED rounding. "Reports can be generated and we ([Division Directors, Program Directors[)] can manage the process …."

164.    Apogee required its hospitalist employees to fill our daily sheets, called "charge slips," and turn them in every day to an Apogee employee in the hospital called a "Patient Information Coordinator," or PIC.  To implement ED rounding, a box was added to the bottom of the charge sheet in which the hospitalist had to write down how many times the physician went to ED and whether he or she scored an admission.  This became a metric looked at by senior leadership to assess a hospital program and its physicians.

165.    In an August 3, 2010 e-mail to Division I Program Directors, Division Director Young announced "[t]he ED Rounding Logs are now being operationalized with a start date of 8/9/10."  Among the reasons for ED Rounding Logs, Young listed that "ED rounds will help even out your patient census and allow us to staff your program more effectively[, and] ED rounds will put your program on a more secure footing, and result in less interference by hospital administration."

166.    In Yakima, Apogee's "ED Rounding" practice was met with derision by the emergency department physicians.  When Kirschner approached the physicians to attempt to recruit patients for admission, she explained that the practice was required by Apogee's policy. In response, the ED doctors would roll their eyes.

167.    "ED Rounding" coincided with the host hospital's interest in increasing its own number of patients.  At Yakima Regional, for example, Apogee and the hospital had agreed to a target of a 15% admission rate in the emergency department.  Apogee's practice helped achieve

this target.  Apogee did not station hospitalists in the emergency department to "properly disposition patients."  Instead, it shared a goal with Yakima Regional to admit borderline patients.  Apogee then required its physicians to falsify the medical necessity of the admission by providing unnecessary care (*e.g.*, more fluids than the patient required) and scrupulously documenting that care.

168.    Apogee's emergency department trolling policy led to the submission by Apogee of false or fraudulent claims for payment to Medicare, Medicaid, and other government health insurance programs.  Apogee submitted insurance claims for all services provided by its hospitalists.  As a result of Apogee's policy, it submitted reimbursement claims for the admission of patients for whom hospital admission was not medically necessary.

169.    In addition, some Apogee physicians coded patient encounters as "internal medicine consults" when they stationed themselves in emergency rooms and persuaded ED doctors to consent to patient admissions.  To bill an encounter as an internal medicine consult requires that another physician refer the patient to the charging doctor, and the physician must record the name of the referring physician.  Apogee's charges for "internal medicine consults" in these circumstances falsely conveyed that the patient had been referred to the Apogee hospitalist by the ER doctor.  This reimbursement requirement had not been met, however, and therefore Apogee's claim for reimbursement was false.

C.    **Improper Medicare and Medicaid Reimbursements to Apogee**

170.    Relators estimate, based on Apogee's and Medicare's accounting and reimbursement data, that for the period covered by the applicable limitations period, 2002 to 2012, Apogee has overcharged Medicare and Medicaid as a result of the upcoding described above by more than $50 million.

171.    This estimate is based on the actual number of patient encounters for the highest-level codes by Apogee hospitalists in Division I for the latest month in which data was available to Relators for each hospital, all in 2010 or 2011, compared to the 2007 national Medicare average.  It also is based on the dollar Medicare reimbursement difference between the upcoded and lowest-level code, using reimbursement amounts for 2011 for the Yakima geographical area.  Further, it assumes a 50% incidence of patients insured by government-funded health insurance programs compared to all patients seen by Apogee hospitalists.

**D.      Apogee Constructively Discharged Relators Because They Objected to Apogee's Illegal Practices**

172.    From the outset and continuously through their employment, Relators objected to Apogee's pressuring them to code at levels not supported by medical necessity.  As a result of these objections and Realtors' refusal to engage in upcoding, Apogee ultimately forced Relators to resign from the company.

173.    On June 24, 2010, Kirschner sent an e-mail to Young, Thompson, and Cervi-Skinner in which she objected to Apogee's practice of canvassing patients in the Emergency Department for admissions or consults.  She stated, "In times of the RAC audits, high costs of medical care in general[,] I feel this puts us on a slippery slope."

174.    On April 13, 2011, Kirschner sent an e-mail to Upegui, Young, and Janet Hawkins (among others) objecting to Upegui's direction to bill 80 to 85% of the physicians' charges as high level charges, and his statement that high level codes do not communicate that "the patient is sicker...."

175.    On April 15, 2011, Young met in person with hospitalists from Yakima Regional. He criticized the hospitalists for, among other things, objecting to and not complying with

Apogee's coding distribution metrics.  He stated that if they did not agree to comply with the metrics and the other expectations of Apogee, they would be terminated for cause.

176.    In a Saturday, April 16, 2011 e-mail to Joy, Young stated that at the prior day's meeting "[w]e … discussed several strategies to improve and some specific areas that need improvement which include but not limited to … improving the metrics which Apogee measures to assess the performance of the program."  He stated that "[y]ou have agreed to either confirm your commitment to the Apogee-Yakima team's success in all of its goals, or provide me with your 60- day termination notice by 12 noon on Monday 4/18/2011."  He added:  "If you confirm your commitment to the Apogee-Yakima team, but you [sic] behavior does not meet expectations, you will be terminated for cause."

177.    Joy responded to Young by e-mail on April 18, 2011.  He challenged the legality of Apogee's prescribed high-level coding distributions, demanding that Apogee provide the distributions to his lawyer.  Maiocco had received a similar e-mail from Young, and Maiocco also demanded that Young supply his lawyer, in writing, with Apogee's required high-level coding distributions.  Young did not provide the physicians' lawyer with Apogee's high-level coding "metrics."

178.    Joy wrote:  "By previous email, I have been told my charges were too low.  I look forward to constructive evaluation.  I am interested in continuing with Apogee and working to build a cohesive team to meet the goals of team and the hospital.  To achieve this end, I need the specific criteria by which my and the team[']s performance is judged, ie[,] my expected levels and percentages of 9922_, 9923_, 99238/239 as well as how all metrics are evaluated.  In addition, anything for which I will be receiving a graded evaluation.  I agree with Dr. Maiocco

that this needs to be received by our contract lawyer, Mr. Larson, before I can give an unqualified acceptance, especially in light of the threatened penalty if performance/behavior is not at goal.  Please provide this information ASAP to myself and Mr. Larson by 4pm today for our scheduled meeting."

179.    Young sent Herr a similar e-mail to the April 16 e-mail he had sent to Joy.  Like the Joy e-mail, this e-mail threatened to fire Herr if he did not "improv[e] the metrics which Apogee measures to assess the performance of the program."

180.    On the same day Herr responded to Young's e-mail.  Copying Thompson, Fran Borg, and Upegui, Herr wrote in his e-mail that he disagreed with Young's assertion that most of Herr's discharges should be coded at the highest possible level.  Herr "disagreed that most of my discharges should qualify as a level -39 based on the actual minutes I can recall being actively involved in the discharge process for my patients over the years."  Herr requested "a written copy of the benchmark goal that I am expected to meet for level -39 discharges[, so] I will be able to more accurately judge w[h]ether or not I can reasonably meet Apogee[']s goals."  Herr requested that Young "FedEx a summary of our meeting per your notes and this statement as well [as] the specific metrics I am expected to help Apogee achieve for our program ASAP so I can review and sign."

181.    When Young received demands that he put in writing the specific required coding distributions he stated were a condition of continued employment, and provide them to the hospitalists' lawyer, he attempted to recant his statement.  On April 16, 2011, he e-mailed Herr that "[t]o the best of my knowledge no one has yet been terminated for a low percentage of a level 3 CPT code or low 99329 percentage if he/she performed well on all other aspects."  He

also stated that Herr was "below the norm for 99239 billing," and he falsely claimed that "[t]he national average for 99239 billing is about 80%."

182.    Yet the next day Young reaffirmed that hospitalists would be punished if they failed to meet Apogee's high-level coding metrics. In a Sunday, April 17, 2011 e-mail to Herr, with copies to Cervi-Skinner, Thompson, Upegui, and Fran Borg, Young wrote that "if a team is markedly below the national average, or within a team, one or more individuals are markedly below the rest of the team, then corrective action will be necessary."

183.    Kirschner attended the April 15, 2011 meeting with Young and received many of the following e-mails exchanged between Young and the other hospitalists. At this time, she resigned as co-director of Yakima Regional's hospitalist program, and she requested a transfer to a small, rural hospital nearby at which Apogee also administered the hospitalist program. In an April 16, 2011 e-mail, Young accepted her resignation and her transfer request, but threatened that "expectations of performance does [sic] not change based on geography." He continued that "[a]ll Apogee employees are expected to ... improve the metrics which Apogee measures to assess the performance of the program."

184.    Kirschner transferred to Apogee's program in Toppenish, Washington. However, she soon concluded that she could not continue to work subject to Apogee's required coding distributions, which she believed were unethical and illegal. She determined that she had no other choice but to terminate her relationship with Apogee. In or about June 2011, she resigned.

185.    Young, in his April 16, 2011 e-mails to Herr, Joy, and Maiocco, had instructed the physicians that, if they did not agree to Apogee's demands, they were to provide their contractual 60-day termination notices. Like Kirschner, Herr, Joy, and Maiocco concluded that

they faced a choice between conforming to Apogee's unethical and illegal high-level coding

distribution requirements and termination from the company.  In or about April 2011, they were

forced to resign.  Their employment with Apogee ended in or about June 2011.

## COUNT I

## FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)

186.    Relators re-allege and incorporate by reference the preceding allegations of this

Complaint.

187.    This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. § 3729, *et seq.*, as amended.

188.    Apogee submitted "upcoded" claims for payment for hospitalist physician

services.  For some of Apogee's claims, the level of service for which it billed was never

provided.  For others, Apogee lied about the level of service needed and changed the government

for non-medically necessary services.  Apogee's claims for these services were not reimbursable

under Medicare, Medicaid, Tricare, the Federal Employee Health Benefits Program, and other

government health insurance programs.  Through these and the other acts described above,

Apogee knowingly presented or caused to be presented false or fraudulent claims, records, and

statements for payment or approval to the United States.

189.    Through the acts described above, Apogee knowingly made, used, or caused to be

made or used materially false records and statements, and omitted material facts, to induce the

United States, through the Medicare, Medicaid, Tricare, the Federal Employee Health Benefits

Program, and other federally funded health insurance programs, to pay or approve such false or

fraudulent claims.

190.    The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by Apogee, paid and continues to pay claims that would not be paid but for Apogee's fraud.

191.    By reason of Apogee's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT II

## FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(G)

192.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

193.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

194.    Apogee performed monthly audits of its hospitalists' compliance with Medicare and Medicaid coding requirements.  These audits demonstrated to Apogee executives that a large percentage of its claims using the highest-level codes were improper and non-reimbursable. Apogee did not notify the government of the overpayments it received, and Apogee has continued to seek reimbursement for claims that it knows were improperly coded at the highest levels.

195.    Through these and the other acts described above, Apogee received overpayments and did not report and return them to the United States and knowingly concealed and knowingly and improperly avoided an obligation to pay or transmit money to the government.

196.    The United States, unaware of the overpayments, has not been repaid for them and continues to make overpayments knowingly concealed and improperly avoided by Apogee.

197.    By reason of Apogee's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT III

### CALIFORNIA FALSE CLAIMS ACT
CAL. GOVT. CODE §§ 12651(a)(1) and (2)

198.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

199.    This is a claim for treble damages and penalties under the California False Claims Act.

200.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described above, Apogee knowingly presented or caused to be presented false or fraudulent claims to the California State Government for payment or approval.

201.    By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

202.    The California State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

203.    By reason of Apogee's acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

204.     The State of California is entitled to the maximum penalty of $10,000 for each

and every false or fraudulent claim, record or statement made, used, presented, or caused to be

made, used, or presented by defendants.

## COUNT IV

### CALIFORNIA INSURANCE CODE
### CAL. INS. CODE § 1871.1(b)

205.     Relators re-allege and incorporate by reference the preceding allegations of this

Complaint.

206.     This is a claim for treble damages and penalties under the California Insurance

Frauds Prevention Act, CAL. INS. CODE § 1871.7, as amended (referred to in this Count as "the

Act"). The Act provides for civil recoveries against persons who violate the provisions of the

Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to

three times the amount of any fraudulent insurance claims, and fines of between $5,000 and

$10,000 for each such claim. CAL. INS. CODE § 1871.7(b).

207.     Subsection (e) of CAL. INS. CODE § 1871.7 provides for a *qui tam* civil action in

order to create incentives for private individuals who are aware of fraud against insurers to help

disclose and prosecute the fraud. CAL. INS. CODE § 1871.1(e). The *qui tam* provision was

patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729-32, and the California False

Claims Act, CAL. GOV'T CODE § 12650 *et seq.*

208.     Subsection (a) of CAL. INS. CODE § 1871.7 provides for civil recoveries against

persons who:

> knowingly employ runners, cappers, steerers, or other persons ... to
> procure clients or patients to perform or obtain services or benefits
> under a contract of insurance or that will be the basis for a claim
> against an insured individual or his or her insurer.

209.    Subsection (b) of CAL. INS. CODE § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550.  Section 549 of the California Penal Code provides criminal penalties for anyone who:

> solicits, accepts, or refers any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether, the individual or entity ... intends to violate Section 550.

210.    Section 550 of the Penal Code prohibits the following activities, among others:

> (a) It is unlawful to do any of the following, or to aid, abet, solicit, of conspire with any person to do any of the following:
>
> *       *       *       *       *       *
>
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
>
> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
>
> *       *       *       *       *       *
>
> (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:
>
> (1) Present or cause to be presented any written or oral statement as apt of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>
> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or

entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

CAL. PENAL CODE § 550.

211.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented, or caused to be presented, false or fraudulent claims for health care benefits, in violation of CAL. PENAL CODE § 550(a).

212.    Each claim for reimbursement that was inflated as a result of Apogee's illegal or fraudulent marketing practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

213.    Private insurers, unaware of the falsity of the records, statements, and claims made or caused to be made by defendants, paid and continue to pay the claims that would not be paid but for Apogee's unlawful conduct.

214.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of CAL. INS. CODE § 1871.7.  Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### COUNT V

### GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### O.C.G.A. § 49-4-168.1(a)(1) and (2)

215.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

216.    This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

217.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

218.    The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

219.    By reason of Apogee's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

220.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT VI

### ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 ILL. COMP. STAT. § 175/3(a)(1) and (2)

221.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

222.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

223.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the Illinois State Government for payment or approval.

224.    By virtue of the acts described above, Apogee knowingly made, used, or caused

to be made or used false records and statements, and omitted material facts, to induce the Illinois

State Government to approve and pay such false and fraudulent claims.

225.    The Illinois State Government, unaware of the falsity of the records, statements,

and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and

continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

226.    By reason of Apogee's acts, the State of Illinois has been damaged, and continues

to be damaged, in substantial amounts to be determined at trial.

227.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and

every false or fraudulent claim, record or statement made, used, presented, or caused to be made,

used, or presented by Apogee.

## COUNT VII

### ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT
### 740 ILL. COMP. STAT. § 92

228.    Relators re-allege and incorporate by reference the preceding allegations of this

Complaint.

229.    This is a claim for treble damages and penalties under the Illinois Insurance

Claims Fraud Prevention Act, 740 ILL. COMP. STAT. § 92.

230.    Subsection 5(a) of the Illinois Insurance Claims Fraud Prevention Act provides:

> [I]t is unlawful to knowingly offer or pay any remuneration
> directly or indirectly, in cash or in kind, to induce any person to
> procure clients or patients to obtain services or benefits under a
> contract of insurance or that will be the basis for a claim against an
> insured person or the person's insurer.

231.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or
> Article 46 of the Criminal Code of 1961 shall be subject, in
> addition to any other penalties that may be prescribed by law, to a
> civil penalty of not less than $5,000 nor more than $10,000, plus
> an assessment of not more than 3 times the amount of each claim
> for compensation under a contract of insurance.

232.    Article 46 of the Illinois Criminal Code, referenced in the above-quoted section,

provides criminal penalties for any person who commits the offense of insurance fraud, defined

in the statute as follows:

> (a) A person commits the offense of insurance fraud when
> he or she knowingly obtains, attempts to obtain, or causes to be
> obtained, by deception, control over the property of an insurance
> company or self-insured entity by the making of a false claim or by
> causing a false claim to be made on any policy of insurance issued
> by an insurance company....

720 ILL. COMP. STAT. § 5/46-1(a).

233.    Subsection 15(a) of the Illinois Claims Fraud Prevention Act provides for a *qui*

*tam* civil action in order to create incentives for private individuals to prosecute violations of the

statute.  Subsection 15(a) provides:  "An interested person, including an insurer, may bring a

civil action for a violation of this Act for the person and for the State of Illinois.  The action shall

be brought in the name of the State."  740 ILL. COMP. STAT. § 92/15(a).

234.    Apogee submitted "upcoded" claims for payment for hospitalist physician

services.  By virtue of these and the other acts described in this Complaint, Apogee committed

the following acts, or aided and abetted the commission of the following acts, in violation of the

Illinois Insurance Claims Fraud Prevention Act:

> knowingly obtained, attempted to obtain, and caused to be
> obtained, by deception, control over the property of an insurance
> company or self-insured entity by the making of a false claim and
> by causing a false claim to be made on a policy of insurance issued

by an insurance company, in violation of 740 ILL. COMP. STAT.
§ 92/5(b) and 720 ILL. COMP. STAT. § 5/46-1(a).

235.    As a result of such conduct, Apogee has received illegal profits to which it was

not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in

substantial amount to be determined at trial.

236.    The Illinois State Government is entitled to receive three times the amount of

each claim for compensation submitted by defendants in violation of 740 Ill. Comp. Stat. § 92.

Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for

each and every violation alleged herein.

## COUNT VIII

## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IND. CODE ANN. §§ 5-11-5.5-2(b)(1), (2), and (8)

237.    Relators re-allege and incorporate by reference the preceding allegations of this

Complaint.

238.    This is a claim for treble damages and penalties under the Indiana False Claims

and Whistleblower Protection Act.

239.    Apogee submitted "upcoded" claims for payment for hospitalist physician

services. By virtue of these and the other acts described in this Complaint, Apogee knowingly

presented or caused to be presented, false or fraudulent claims to the Indiana State Government

for payment or approval.

240.    The Indiana State Government, unaware of the falsity of the records, statements,

and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and

continues to pay the claims that would not be paid but for Apogee's unlawful conduct.

241.    By reason of the Apogee's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

242.    The State of Indiana is entitled a penalty of at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Apogee.

## COUNT IX

### LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY LAW
### LA. REV. STAT. § 46:438.3(A) and (B)

243.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

244.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Program Integrity Law.

245.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

246.    The Louisiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

247.    By reason of the Apogee's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

248.     The State of Louisiana is entitled to the maximum penalty of $10,000 for each

and every false or fraudulent claim, record or statement made, used, presented, or caused to be

made, used, or presented by Apogee.

## COUNT X

### NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. § 2A:32C-3(a) and (b)

249.     Relators re-allege and incorporate by reference the preceding allegations of this

Complaint.

250.     This is a claim for treble damages and penalties under the New Jersey False

Claims Act.

251.     Apogee submitted "upcoded" claims for payment for hospitalist physician

services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly

presented or caused to be presented false or fraudulent claims to the New Jersey State

Government for payment or approval.

252.     By virtue of the acts described above, Apogee knowingly made, used, or caused

to be made or used false records and statements, and omitted material facts, to induce the New

Jersey State Government to approve and pay such false and fraudulent claims.

253.     The New Jersey State Government, unaware of the falsity of the records,

statements, and claims made, used, presented, or caused to be made, used, or presented by

Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent

practices.

254.     By reason of Apogee's acts, the State of New Jersey has been damaged, and

continues to be damaged, in substantial amounts to be determined at trial.

255.    The State of New Jersey is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XI

### NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. STAT. ANN. §§ 27-14-4(A)-(C)

256.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

257.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

258.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

259.    The New Mexico State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

260.    By reason of Apogee's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

261.    The State of New Mexico is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XII

### NEW YORK FALSE CLAIMS ACT
### NY CLS ST. FIN. § 189(1)(a), (b), and (g)

262.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

263.    This is a claim for treble damages and penalties under the New York False Claims Act.

264.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the New York State Government for payment or approval.

265.    By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

266.    The New York State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

267.    Apogee performed monthly audits of its hospitalists' compliance with Medicare and Medicaid coding requirements.  These audits demonstrated to Apogee executives that a large percentage of its claims using the highest-level codes were improper and non-reimbursable. Apogee did not notify the New York State Government of the overpayments it received, and

Apogee has continued to seek reimbursement for claims that it knows were improperly coded at the highest levels.

268.    Through these and the other acts described above, Apogee received overpayments and did not report and return them to the New York State Government and knowingly concealed and knowingly and improperly avoided an obligation to pay or transmit money to the New York State Government.

269.    The New York State Government, unaware of the overpayments, has not been repaid for them and continues to make overpayments knowingly concealed and improperly avoided by Apogee.

270.    By reason of Apogee's acts, the State of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

271.    The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XIII

### NORTH CAROLINA FALSE CLAIMS ACT
### N.C. GEN. STAT. ART. 52 § 1-607(a)(1) and (2)

272.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

273.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

274.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee ts knowingly

presented or caused to be presented false or fraudulent claims to the North Carolina State Government for payment or approval.

275.   By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

276.   The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by defendants, paid and continues to pay the claims that would not be paid but for Amgen's false and illegal off-label marketing practices and illegal kickbacks.

277.   By reason of the Apogee's acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

278.   The State of North Carolina is entitled to the maximum penalty of $5,500-$11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XIV

### OKLAHOMA MEDICAID FALSE CLAIMS ACT
### OKLA. STAT. 63 § 5053.1(b)(1) and (2)

279.   Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

280.   This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

281.   Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly

presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

282.    The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's unlawful promotion.

283.    By reason of the Apogee's acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

284.    The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

**COUNT XV**

**TENNESSEE MEDICAID FALSE CLAIMS ACT**
**TENN. CODE ANN. § 71-5-182(a)(1)(A) and (B)**

285.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

286.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

287.    Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the Tennessee State Government for payment or approval.

288.   By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

289.   The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

290.   By reason of the Apogee's acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

291.   The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XVI

### TEXAS MEDICAID FRAUD PREVENTION LAW
#### TEX. HUM. RES. CODE ANN. § 36.002(1) and (4)

292.   Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

293.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

294.   Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the Texas State Government for payment or approval.

295.     By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

296.     The Texas State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

297.     By reason of Apogee's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

298.     The State of Texas is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XVII

### VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. § 8.01-216.3(a)(1) and (2)

299.     Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

300.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

301.     Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the Virginia State Government for payment or approval.

302.     By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

303.     The Virginia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

304.     By reason of Apogee's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

305.     The Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XVIII

### WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
### REV. CODE WASH. § 74.09C.010, *et seq.*

306.     Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

307.     This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act.

308     Apogee submitted "upcoded" claims for payment for hospitalist physician services.  By virtue of these and the other acts described in this Complaint, Apogee knowingly presented or caused to be presented false or fraudulent claims to the Washington State Government for payment or approval.

309.    By virtue of the acts described above, Apogee knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

310.    The Washington State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Apogee, paid and continues to pay the claims that would not be paid but for Apogee's fraudulent practices.

311.    By reason of Apogee's acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

312.    The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Apogee.

## COUNT XXIX

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)

313.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

314.    By constructively discharging and terminating the employment of Relators, and otherwise discriminating and retaliating against them, Apogee violated 31 U.S.C. § 3730(h), which prohibits an employer from discharging or otherwise discriminating against or retaliating against an employee because of acts undertaken by that employee in furtherance of stopping violations of the False Claims Act.

315.    As a result of Apogee's wrongful actions, Relators suffered and continue to suffer substantial damage.

## COUNT XXX

### NEW JERSEY FALSE CLAIMS ACT
### N.J. STAT. § 2A:32C-10

316.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

317.    By constructively discharging and terminating the employment of Relators, and otherwise discriminating and retaliating against them, Apogee violated New Jersey Stat. § 2A:32C-10, which prohibits an employer from discharging, or in any manner discriminating against or retaliating against an employee because of acts undertaken by that employee in disclosing to the government or otherwise furthering a false claims action.

318.    As a result of Apogee's wrongful actions, Relators suffered and continue to suffer substantial damage.

## COUNT XXXI

### WRONGFUL DISCHARGE IN VIOLATION OF
### THE CONSCIENTIOUS EMPLOYEE PROTECTION ACT
### N.J. STAT. § 34:19-5

319.    Relators re-allege and incorporate by reference the preceding allegations of this Complaint.

320.    Relators' terminations were in violation of the Conscientious Employment Protection Act, N.J.S.A. 34:19-1 et seq ("CEPA").

321.    Apogee satisfies the definition of "Employer" under CEPA.

322.    Relators satisfy the definition of "Employee" under CEPA.

323.    Relators had a reasonable and good faith belief that Apogee's upcoding practices alleged above constituted a violation of a law, rule or regulation, constituted improper quality of patient care, were fraudulent or criminal, and/or were incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

324.    Relators objected and complained regarding the foregoing, which they reasonably believed to be a violation of New Jersey laws, rules and regulations.

325.    Relators' concerns, objections and complaints were ignored.

306.    In or about June 2011, Relators were constructively discharged from Apogee for refusing to comply with Apogee's illegal practices.

326.    Relators' disclosures to Apogee executives, objections, and refusal to engage in illegal conduct were protected pursuant to the provisions of N.J.S.A. 34:19-3(a) and (c)(1), (2) and (3).

327.    The actions of Apogee in terminating the employment of Relators and otherwise adversely affecting Relators' employment as set forth herein were in retaliation for Relators' complaints and objections and/or refusal to participate in activities, policies and practices of Apogee.

328.    As a proximate result of the improper and illegal conduct of Apogee, Relators have sustained bodily injury and severe emotional distress, have undergone and will continue to undergo pain and suffering, have been unable to attend to their usual and customary activities, have experienced a loss of self-esteem, have experienced a loss of the enjoyments of life, have lost income and other personal financial needs, and have suffered other economic and non-economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves individually and acting on behalf of the United States and the listed States, pray that judgment be entered against Apogee as follows:

A.      That Apogee be ordered to cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the listed State False Claims Acts.

B.      That this Court enter judgment against Apogee in an amount equal to three times the amount of damages the United States has sustained because of Apogee's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, with interest.

C.      That this Court enter judgment against Apogee in an amount equal to three times the amount of damages the States have sustained because of Apogee's actions, plus a civil penalty according to the provisions of each State's False Claims Act.

C.      That Relators be awarded the maximum amount available under Sections 3730(d) and 3730(c)(5) of the False Claims Act and the corresponding provisions in the States' False Claims Acts.

D.      That Relators be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d) and the corresponding provisions in the States' False Claims Acts.

E.      That Relators be awarded reinstatement with the same seniority status as they would have but for the discrimination, two times the amount of backpay, interest on the backpay, and compensation for special damages sustained as a result of the discrimination, as well as litigation costs and attorneys' fees, pursuant to 31 U.S.C. § 3730(h).

F.      That Relators be awarded reinstatement with the same seniority status that they would have had but for the discrimination, two times the amount of backpay, interest on the backpay, compensation for special damages sustained as a result of the discrimination, punitive damages, as well as litigation costs, expenses, and attorneys' fees, pursuant to N.J. Stat. § 2A:32C-10.

G.      That Relators be awarded all available damages, including punitive damages, and injunctive relief resulting from their wrongful termination, as well as litigation costs, expenses, and attorneys' fees, pursuant to N.J. Stat. § 34:19-5; and

H.      And, such other relief shall be granted in the favor of the United States, the States, and Relators as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand trial

by jury.


Dated:  October 26, 2012

By: _Art Zucky/mm_____

Arthur P. Zucker, Esq.
**FERRO LABELLA & ZUCKER L.L.C.**
azucker@ferrolabella.com
27 Warren Street
Hackensack, NJ 07601
Tel: (201) 489-9110
Fax: (201) 489-5653

**HAGEN BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
steve@hbsslaw.com
Jeffrey T. Sprung
jeffs@hbsslaw.com
1918 Eighth Avenue, Ste. 3300
Seattle, Washington 98101
Tel: (206) 623-9292
Fax: (206) 623-0594

Attorneys for *Qui Tam* Plaintiffs